**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

MAMTA DHIR,                :

                       :

     **Plaintiff,**         :

                       :

     **v.**                   :       3:14-cv-1905 (VLB)

                       :

**WELLS FARGO BANK, N.A.**    :       **March 1, 2016**

                       :

     **Defendants.**      :

**MEMORANDUM OF DECISION GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT [DKT. 56]**

### I.   Introduction

Plaintiff Mamta Dhir, a former employee of Defendant Wells Fargo Bank, N.A. ("Wells Fargo") brings this action for employment discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 56a-60(a)(1), the Americans with Disabilities Amendments Act ("ADAA"), 42 U.S.C. § 12112(a), and the Connecticut Workers' Compensation Act ("CWCA"), Conn. Gen. Stat. § 31-290a.  The Defendant has filed a Motion for Summary Judgment.  [Dkt. 56].  For the reasons that follow, Defendant's motion is GRANTED.

### II.   Factual Background

Wells Fargo is a nationwide, diversified financial services company that provides banking, insurance, investments, mortgage, and consumer and financial banking services.  [*See* Dkt. 58-1, Affidavit of Jeffrey Bruneau ("Bruneau Aff.") ¶ 3].  Plaintiff is female, was born in India, and is Asian (Indian).  [Dkt. 58-3, Deposition of Mamta Dhir ("Dhir Dep.") at 16, 20-21].  She moved to the United

1

States in 1982.  *Id.* at 21-22.  Plaintiff became a store manager in Wells Fargo's Prospect, Connecticut store in August 2011.  [Dkt. 21 ¶ 14; Dhir Dep. at 31, 80]. As store manager, Plaintiff was responsible for the store's performance, operations, and employees, and managed customer service, staffing, cash flow, sales, and compliance with Wells Fargo policies and procedures.  [Bruneau Aff. ¶ 14; Dhir Dep. at 31-32].  Plaintiff had three direct reports:  two Personal Bankers and the Service Manager, Joy Robertson.  [Dhir Dep. at 34-35].  Tellers reported to Ms. Dhir through Ms. Robertson.  [Dhir Dep. at 35].

### A.  Policies and Procedures

Wells Fargo maintains "Diversity and Inclusion," "Affirmative Action, EEO, & Diversity," anti-harassment, and "Nonretaliation" policies.  [Bruneau Aff. ¶ 5; Dkt. 58-2 ("Handbook") at WF000004].  The Handbook sets forth the following hiring policy:  "Our policy is that we do not discriminate on the basis of race, color, gender, national origin, religion, age, sexual orientation, gender identity, genetic information, physical or mental disability, pregnancy, marital status, veteran status, or any other status protected by federal, state or local law."  [*Id.* at WF000029].  The Handbook also directs employees to contact Human Resources when the employee "need[s] advice or help in solving an issue that [he or she] ha[s] on the job."  [*Id.* at WF000008].  Should the employee have a dispute, he or she is advised to first resolve the issue with the direct manager, or if the dispute cannot be resolved, to then seek out the Dispute Resolution Resources referenced in the Handbook.  [*Id.* at WF000046].

Wells Fargo also maintains a "Code of Ethics & Business Conduct," which requires each employee to be "consistently honest and trustworthy in everything one does," and to "prepar[e] and maintain[] accurate records."  [*Id.* at WF000014-WF000021; Dhir Dep. at 46-49].  The code also prohibits "[f]alsification of any company or personal information" and gaming, or the "manipulation, misrepresentation, or both of sales or sales reporting in an attempt to receive compensation or to meet sales goals."  [Handbook at WH000019-20; Dhir Dep. at 46-49, 53-56].  Managers in particular are expected "to exemplify the highest standards of ethical behavior," "[t]o ensure that team members understand that business results are never more important than ethical conduct and compliance with applicable law and Wells Fargo's policies," and "[t]o ingrain the principles of the Code and compliance with applicable laws, regulations, and Wells Fargo's policies into [their] business unit's practices."  [Handbook at WF000022; Dhir Dep. at 57-58, 65-66].  Defendant's "Immediate Dismissal" policy states that (1) violating the ethics code; (2) falsification of records, including "[e]ntering false sales or referrals on a sales tracking system," or (3) gaming, "may result in immediate termination of employment."  [Handbook at WF000065; Dhir Dep. at 62-63].

At the time Plaintiff was employed, Wells Fargo ran a "Teller Referral" program that encouraged tellers to (1) uncover a customer's potential need for a financial product or service and, if the customer was amendable, (2) refer him or her to a Personal Banker to discuss the product or service further.  [Bruneau Aff. ¶¶ 6-8; Dhir Dep. at 50-53, 68-75; Dkt. 58-4 ("Sales Quality Manual") at WF000080].

3

If the referral resulted in a sale of a product or service, the teller would receive credit, and managers would be evaluated in part based on the number of credits tellers earned.  [Bruneau Aff. ¶¶ 9-10].  The program was governed by a Sales Integrity Policy, which prohibited "manipulations and/or misrepresentations of sales or referrals and reporting of sales or referrals in an attempt to receive compensation or to meet sales goals that is inconsistent with customer needs." [Sales Quality Manual at WF000072].  Sales integrity violations could "result in disciplinary action, up to and including disqualification from participation in incentive compensation plans and termination of employment."  *Id.*

An "unearned referral" occurs when a teller is given credit for a referral that did not result from uncovering a customer's potential need for a product or service.  [Bruneau Aff. ¶ 11; Dhir Dep. at 50-53; Sales Quality Manual at WF000080].  For instance, if a teller obtains a credit for a sale when the teller had no contact with the customer, this credit would be "unearned," and the behavior would be considered impermissible "gaming."  *Id.*  Other types of "inappropriate" sales behavior described in the Sales Quality Manual included:  (1) "[s]ubmitting a referral after directing a customer who came into the store with the intent to purchase a product or service, even if other products or services are discussed before the customer is directed to the banker"; (2) "[b]ankers supplying tellers with customer information to input as a referral when the teller did not have any contact with the customer"; (3) "[r]esubmitting a referral without having an additional sales conversation and without regaining consent from the customer"; (4) "[r]eceiving referral credit for yourself or any other store personnel (e.g., a

4

teller cannot refer another teller to a banker for referral credit)"; (5) "[a] teller submitting a referral after translating for a customer or banker without uncovering a need for a product or service"; and (6) "[e]ntering teller referrals for customers at a *Wells Fargo at Work* offsite event."  [Sales Quality Manual at WF000080].

Plaintiff's compensation as Store Manager included a "quarterly incentive compensation opportunity," which was based, in part, on teller contributions. [Bruneau Aff. ¶ 19; Dhir Dep. at 49-52, 76; Dkt. 58-7 ("Compensation Plan") at DWF000608].  Plaintiff was also eligible for a "coach's bonus" of 15 percent of store team members' incentive compensation payments, which was also based on teller credits.  [Bruneau Aff. ¶ 19; Dhir Dep. at 76-78; Compensation Plan at DWF000608].

### B. Plaintiff's Disability

On or around August 12, 2013, Plaintiff tripped while at work, injuring her shoulder, neck, knees, and right ankle.  [Dkt. 21 at ¶ 16; Dhir Dep. at 134-36]. Plaintiff reported her injury to Wells Fargo the next day, and took a day and a half off to seek medical treatment.  [Dkt 21 ¶ 17; Dhir Dep. at 137-38].  Thereafter, Wells Fargo permitted the Plaintiff to go to physical therapy appointments two to three days a week during her workday.  [Dhir Dep. at 139-40].  Wells Fargo also accommodated Plaintiff's lifting restrictions.  [Dhir Dep at 143-44].  Plaintiff attended therapy through September and October 2013, and Defendants claim that she complained to Mr. Bruneau that her doctors "were forcing [her] to start therapy again," to which Plaintiff claims Mr. Bruneau responded, "they want you

to continue so they can make money."  [Dkt. 21 ¶ 22; Dhir Dep. at 142].  Plaintiff also claims that Mr. Bruneau and Area President Kent McClun asked her how long she would require treatment.  [Dkt. 21 ¶ 21; Dhir Dep. at 262-64].

### C.  Informal Warning

In mid-2013, a teller complained to Wells Fargo that the Plaintiff had discriminated against him because of his religion.  [Bruneau Aff. ¶ 20; Dhir Dep. at 146-53; Kent Aff. ¶ 3].  Employee relations investigated this claim, but determined that the Plaintiff had not discriminated against him.  [Bruneau Aff. ¶ 21; Dhir Dep. at 146-62; Kent Aff. ¶ 4].  During the course of the investigation, however, Plaintiff's subordinates described her behavior as "threatening, condescending, horrifying, and degrading."  [Bruneau Aff. ¶¶ 22-23; Dhir Dep. at 152-54; Dkt. 58-10].  Wells Fargo found these claims credible, and concluded that Plaintiff's "poor judgment and unprofessional behavior" violated its Professionalism and Code of Ethics and Business Conduct policies.  [Bruneau Aff. ¶¶ 22-23; Dhir Dep. at 152-54; Dkt. 58-10].  Plaintiff was given an "Informal Warning" based on these findings.

### D.  Referrals

During the course of the investigation into the religious discrimination claim, tellers told Employee Relations that the store had been submitting unearned referrals.  [Kent Aff. ¶ 5; Bruneau Aff. ¶ 24; Dhir Dep. at 149-50].  Plaintiff separately informed Wells Fargo District Manager Jeffrey Bruneau that her subordinates were submitting unearned referrals.  [Dkt. 21 ¶¶ 24, 26-27; Dhir Dep. at 162-63].  Mr. Bruneau asked Plaintiff to let him handle the matter because

if Plaintiff formally reported the unearned referrals, the report might be perceived as retaliation for the discrimination complaint and her subordinates' participation in the accompanying investigation.  [Dkt. 21 ¶¶ 28-30, 33; Dhir Dep. at 163-64].

After Plaintiff continued raising the issue with Mr. Bruneau, Plaintiff called Wells Fargo's "EthicsLine" and reported the unearned referrals.  [Dkt. 21 ¶ 32; Bruneau Aff. ¶ 25; Dhir Dep. at 163-64, 173-79; Dkt. 58-11].  Plaintiff also gave Mr. Bruneau documents purportedly showing instances of unearned referrals by her subordinates.  [Dkt. 21 ¶ 27; Dhir Dep. at 179-88; Dkt 58-12].  Wells Fargo dispatched an investigator to look into the unearned referrals, and he met with each store employee individually.  [Bruneau Aff. ¶ 27; Dhir Dep. 189-98].  On October 30, 2013, Joy Robertson told the investigator that she gave tellers unearned referrals as part of a plan that Ms. Robertson and the Plaintiff concocted to alleviate teller frustration.  [Bruneau Aff. ¶ 28; Dhir Dep. at 204-05].  During Plaintiff's November 4, 2013 interview with the investigator, Plaintiff admitted that she too awarded unearned referrals, rationalizing that she only agreed to award unearned referrals "to stop the ongoing battle with Joy." [Bruneau Aff. ¶ 33; Dhir Dep. at 197-98; Dkt. 58-14].

### E.  Termination

The investigator presented his findings on a November 5, 2013 conference call with Employee Relations Consultant Jennifer Kent, Human Resources Business Partner Ryan Muir, Regional President Joseph Kirk, and Mr. Bruneau. Mr. Kirk and Mr. Bruneau recommended issuing a written warning, but Ms. Kent believed that termination was warranted.  [Bruneau Aff. ¶ 36; Kent Aff. ¶¶ 10-11;

7

Dkt. 58-15 at WF000125].  On November 6, 2013, Ms. Kent convened a conference call with the investigator and Employee Relations Manager Anne Cox.  [Kent Aff. ¶¶ 12; Dkt. 58-15 at WF000125-WF000126; Dkt. 58-16 ("Cox Aff.") ¶ 3].  Ms. Kent and Ms. Cox concluded that Plaintiff gave tellers unearned referrals, that this conduct violated the "Acting with Honesty, Integrity, & Trustworthiness" policy, and that Plaintiff should be terminated.  [Dhir Dep. at 210-13; Kent Aff. ¶¶ 14-15; Dkt 58-15 at WF000125-WF000126; Cox Aff. ¶¶ 4-6].

Mr. Bruneau informed the Plaintiff that she had been terminated on December 6, 2013 for awarding unearned referrals in violation of Wells Fargo's policies.  [Bruneau Aff. ¶ 38].  Ms. Robertson was also terminated.  [Kent Aff. ¶ 15; Cox Aff. ¶ 6].  However, the tellers under Plaintiff's supervision only received written warnings, because Ms. Kent and Ms. Cox determined that the tellers accepted the unearned referrals as part of the Plaintiff's and Ms. Robertson's "plan," and because Wells Fargo's investigation had determined that the tellers had been subjected to a "hostile work environment."  [Kent Aff. ¶ 19; Dkt 58-18 at WF000125-WF000126; Cox Aff. ¶ 10].

Plaintiff claims that Mr. Bruneau did not "stand up" for her in the discussions which led to her termination.  [Dhir Dep. at 247-49].  In support of her assertion that her termination was discriminatory, Plaintiff, who is Asian, testified that Mr. Bruneau made a comment about her "culture," and said of her new car, "All you guys believe in these kind of models."  [Dhir Dep. at 247-49].  Although he stated that Asians preferred a particular type of car, Plaintiff neither alleges nor presents facts tending to establish that Mr. Bruneau considered the

preference reflected negatively on Asians.  Plaintiff also testified that Mr. Bruneau was aware of her age because she told him that she would be turning 50.  [Dhir Dep. at 251-54, 59-60].  She does not assert or present any facts tending to show that Mr. Bruneau made any disapproving comments about her age.

Mr. Bruneau selected a white, male Store Manager from another store in Mr. Bruneau's district to replace the Plaintiff.  [Bruneau Aff. ¶¶ 39-40; Dhir Dep. at 251].  Ms. Robertson's replacement was female and Indian-American.  [Bruneau Aff. ¶ 41].  Defendant claims that neither Ms. Kent nor Ms. Cox knew Plaintiff was Asian.  [Kent Aff. ¶ 16; Cox Aff. ¶ 7].  Defendant also claims that neither Ms. Kent nor Ms. Cox were aware of Plaintiff's injury or her age when they decided to terminate her employment.  [Kent Aff. ¶ 17; Cox Aff. ¶ 8].

Between January 2012 and July 2016, Defendant terminated two Store Managers and three Service Managers in Connecticut for misconduct related to unearned referrals:  (1) Plaintiff; (2) Store Manager Nathan Sherwood, a white man; (3) Ms. Robertson, a black woman; (4) Service Manager Janet Smith, a black woman; and (5) Service Manager Monika Malhota, a Hispanic woman.  [Bruneau Aff. ¶ 43].  None of these non-Asian individuals had any known disabilities.  *Id.* ¶ 44.

## III.   <u>Standard of Review</u>

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

**9**

judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion."  Fed. R. Civ. P. 56(a).   In order to prevail, the moving party must sustain the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought.  *Id.*  (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (quotation omitted).  In addition, "the court should not weigh evidence or assess the credibility of witnesses" on a motion for summary judgment, as "these determinations are within the sole province of the jury."  *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

"A party opposing summary judgment 'cannot defeat the motion by relying on the allegations in [her] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.'  At the summary judgment stage of the proceeding, [p]laintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (quoting *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir. 1996)).  "Summary judgment cannot

10

be defeated by the presentation . . . of but a 'scintilla of evidence' supporting [a] claim." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (quoting *Anderson*, 477 U.S. at 251).

A court must make the threshold determination of whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. *Anderson*, 477 U.S. at 250. Judges are not required "to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party. Formerly it was held that if there was what is called a *scintilla* of evidence in support of a case the judge was bound to leave it to the jury, but recent decisions of high authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 14 Wall. 442, 448, 20 L.Ed. 867 (1872)) (citing *Pennsylvania R. Co. v. Chamberlain,* 288 U.S. 333, 343 (1933); *Coughran v. Bigelow,* 164 U.S. 301, 307 (1896); *Pleasants v. Fant,* 22 Wall. 116, 120–121 (1875)). Indeed, summary judgment should be granted where the evidence is such that it "would require a directed verdict for the moving party." *Sartor v. Arkansas Gas Corp.*, 321 U.S. 620, 624 (1944).

"A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1).  A party may also support their assertion by "showing that the materials cited do not establish the absence . . . of a genuine dispute."  *Id.* Cited documents must consist of either "(1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial."  Local R. Civ. P. 56(a)3; *see also* Fed. R. Civ. P. 56(c)(4).

The Court need not consider any materials that the parties have failed to cite, but may in its discretion consider other materials in the record.  Fed. R. Civ. P. 56(c)(3).  If a party fails to properly support an assertion of fact, or fails to properly address another party's assertion of fact, the Court may grant summary judgment on the basis of the undisputed facts.  D. Conn. Local R. 56(a)3 (stating that "failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence admitted in accordance with [Local] Rule 56(a)1 or in the Court imposing sanctions, including . . . an order granting the motion if the undisputed facts show that the movant is entitled to judgment as a matter of law").[1]  Because

---

[1] While Rule 56(e) also permits the Court to give a party the "opportunity to properly support or address the fact," such a course of action is not warranted. Defendants complied with Local Rule 56(b)'s mandate to provide *pro se* plaintiffs with notice of the procedures required to oppose a motion for summary judgment.  [See Dkt. 56].  Plaintiff therefore was aware of these requirements before filing her opposition, and has not suggested that she will produce a brief that comports with Rule 56 if given the opportunity to do so.

Plaintiff has filed no Rule 56(a) statement, the Court is not obligated to consider any of the facts Plaintiff asserts in her Opposition.  However, the Court has nevertheless considered facts asserted in Plaintiff's Opposition where they are supported by admissible evidence elsewhere in the record.

## IV.   Discussion

Plaintiff claims that Wells Fargo discriminated against her on the basis of her race, sex, and disability, and retaliated against her for filing a claim for workers' compensation.[2]  Upon review of all facts supported by evidence properly admitted to the record, the Court finds no genuine issues of fact that would preclude summary judgment.

### A.   Race and Gender Discrimination Claims

Courts analyze CFEPA and Title VII claims using the same legal standards.  *See Kaytor v. Elec. Board Corp.*, 609 F.3d 537, 556 (2d Cir. 2010); *Craine v. Trinity Coll.*, 259 Conn. 625, 637 n.6 (2002)).  Title VII claims are evaluated using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010); *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996).  "Under this framework, a plaintiff must first establish a *prima facie* case of discrimination."  *Ruiz*, 609 F.3d at 491 (citation omitted).  "The burden of proof that must be met to permit an employment discrimination plaintiff to survive a summary judgment motion at the prima facie stage is *de minimis*."  *Chambers v.*

---

[2] Although Plaintiff mentioned age discrimination in her deposition, her Amended Complaint does not allege age discrimination.  [*See* Dkt. 21].  The Court therefore declines to rule on this issue.

*TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).  "Once a plaintiff meets this initial burden, the burden then shifts to the defendant to offer a legitimate non-discriminatory reason for the termination."  *Ruiz*, 609 F.3d at 492 (citation omitted).  If the defendant offers a legitimate non-discriminatory reason for the termination, "the burden returns to the plaintiff to show that the real reason for plaintiff's termination was his race and national origin."  *Id.*  (citation omitted).

      1.  <u>Prima Facie Case</u>

      To establish a prima facie case of disparate treatment, "a plaintiff must show that (1) [s]he is a member of a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination."  *Ruiz*, 609 F.3d at 491-92 (citation omitted).  The parties do not dispute that, as a woman of Indian descent, Plaintiff is a member of a protected class, that she was qualified for her position as a Store Manager, and that she suffered adverse employment actions when she was terminated.  However, the facts in the record do not evidence circumstances giving rise to an inference of discrimination.

      Evidence giving rise to an inference of discrimination includes (1) the employer's criticism of the plaintiff's performance in ethnically degrading terms; (2) invidious comments about others in the employee's protected group; or (3) the more favorable treatment of employees not in the protected group.  *See Chambers*, 43 F.3d at 37.  "Because an employer who discriminates is unlikely to leave a 'smoking gun' attesting to a discriminatory intent, a victim of

discrimination is seldom able to prove [her] claim by direct evidence, and is usually constrained to rely on circumstantial evidence." *Id.* A plaintiff usually presents a prima facie case by "showing that the employer . . . treated [the employee] less favorably than a similarly situated employee outside [her] protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). The plaintiff must be "similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Id.* (citations omitted).

"Whether two employees are similarly situated ordinarily presents a question of fact for the jury." *Id.* However, "where a plaintiff seeks to establish the minimal prima facie case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001); *see also Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001) ("[A] court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.").

Plaintiff named tellers who claimed unearned referrals, but were not terminated, as alleged comparators. However, Wells Fargo offered unrebutted evidence that it believed the tellers to be less culpable than the Plaintiff or Ms. Robertson, because (1) Plaintiff and Ms. Robertson encouraged the tellers to claim unearned referrals; and (2) the tellers felt "bullied" by the Plaintiff or characterized their work environment as "extremely hostile." [Dhir Dep. at 198-208; Kent Aff. ¶ 19; Dkt. 58-15 at WF000122; Cox Aff. ¶ 10]. Additionally, Plaintiff

15

was the manager of all branch employees, including the tellers, and the evidence does not show that Plaintiff shared the tellers' job duties or responsibilities. [*See* Dhir Dep. at 31-32; *Robertson v. Wells Fargo Bank, N.A.*, No. 3:14-CV-01861 (VLB), 2017 WL 326317, at *9 (D. Conn. Jan. 23, 2017) (holding that Ms. Robertson did not present a prima facie case because as a Service Manager, she was similarly situated to her supervisor Ms. Dhir, but she was not similarly situated to the tellers she directly supervised)]. The evidence in the record therefore does not raise a genuine issue of fact suggesting that Plaintiff's alleged comparators bore "a reasonably close resemblance" with respect to Plaintiff's conduct or the conditions of her employment. *See Graham*, 230 F.3d at 40.

Moreover, the fact that Plaintiff's position was filled by a Caucasian male of European descent does not give rise to an inference of discrimination under the circumstances present in this case. First, the only other Store Manager in Connecticut who was terminated due to unearned referrals was also a white man. [Bruneau Aff. ¶ 43]. Second, Ms. Robertson, a black woman similarly terminated for encouraging tellers to take unearned referral credits, was replaced by an Indian-American woman. [Bruneau Aff. ¶ 41].

Plaintiff admitted that she did not know who decided to terminate her, that she was not privy to discussions about her termination, and that she did not know if her immediate supervisor, Mr. Bruneau, recommended termination. [Dhir Dep. at 253-54]. Wells Fargo, on the other hand, has offered undisputed evidence that Mr. Bruneau recommended that Plaintiff not be terminated, and that Ms. Cox and Ms. Kent decided to terminate Plaintiff over his objections. [Bruneau Aff. ¶

36; Kent Aff. ¶¶ 10-12, 14-15; Dkt. 58-15 at WF000125-126; Cox Aff. ¶¶3-6].  Mr.

Bruneau's comments about Plaintiff's "culture" or her new car and the Plaintiff's

factually unsupported allegation that Mr. Bruneau failed to "stand up" for her

during the "referral process," are thus irrelevant to whether Plaintiff's termination

was racially motivated.

Although Plaintiff cannot establish a prima facie case of disparate

treatment, the Court nevertheless will proceed with the remaining steps of the

*McDonnell Douglass* framework.

### 2.  Legitimate Non-Discriminatory Reason

Supposing a plaintiff establishes a prima facie case, "the burden shifts to

the employer to come forward with a legitimate, nondiscriminatory reason for the

adverse employment action."  *Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir.

2012).  Here, Wells Fargo stated that it terminated Plaintiff for the

nondiscriminatory reason that she violated the company's sales referral policy

and suborned others to do the same.  Plaintiff submitted this handwritten

statement to a Wells Fargo investigator:

> "Joy [Robertson] came up with the plan to help the teller frustration that if
> tellers are trying hard & consistent with 5 or 6 walkovers [on] a daily basis
> & getting nothing then we should give them something once in a while.  To
> stop this battle & I couldn't take this argument with Joy & my staff, I told
> Joy when this kind of frustration or situation occur[s], please bring it to my
> attention & at that point we will see why [personal bankers] are not able to
> close any deals for the tellers[.]  At that point if you think we need to give
> tellers something to boost his or her moral[e] then we will decide at that
> point."

[Dkt. 58-14 at WF000205].  The investigator also asked Plaintiff in writing, "How

many times did you approve a teller referral that was not earned, under the plan

that you and Joy discussed, for your tellers this year[?].”  [*Id.* at WF000206].  She replied, “As I recall it once or twice.”  *Id.*  The Code of Ethics & Business Conduct states, “Only valid sales referrals made by the team member seeking the credit may be submitted to meet sales goals or receive credit under sales incentive programs.”  [Handbook at WF000020].  And a violation of the Code is “grounds for corrective action, which may include termination of . . . employment.”  [*Id.* at WF000014].  Plaintiff also admitted that it is inappropriate for a team member to enter a sale and assign it to another team member who did not make the sale.  [Dhir Dep. at 50-51].  Her conduct violated company policy and her violation was punishable by employment termination.  As such, Wells Fargo had a non-discriminatory reason taking this action.

### 3.  Pretext

If the employer cites a proper explanation for the adverse employment action, the plaintiff must show pretext.  *Ruiz*, 609 F.3d at 492.  “Pretext may be demonstrated either by the presentation of additional evidence showing that the employer’s proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more.”  *Chambers*, 43 F.3d at 38 (quotations and citations omitted); *Lifranc v. New York City Dep’t of Educ.*, No. 07-CV-1109 (KAM) (LB), 2010 WL 1330136, at *10 (E.D.N.Y. Apr. 6, 2010) (citing *Gallo v. Prudential Residential Servs., Ltd. P’ship*, 22 F.3d 1219, 1225 (2d Cir. 1994)) (stating a plaintiff may survive summary judgment “through direct, statistical, or circumstantial evidence as to whether the employer's reason for its decision to discharge is false and as to whether it is more likely that a

discriminatory reason motivated the employer to make an adverse employment decision").  The ultimate question on summary judgment is whether "the employee's admissible evidence . . . show[s] circumstances that would be sufficient to permit a rational finder of fact to infer that the employer's employment decision was more likely than not based in whole or in part on discrimination."  *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)).

Plaintiff fails to demonstrate that her violation of the Code of Ethics was pretext.  A plaintiff may not establish pretext through mere speculation, *see Crawford-Mulley v. Corning Inc.,* 194 F. Supp. 2d 212, 220 (W.D.N.Y. 2002), and no evidence suggests that Ms. Kent and Ms. Cox decided to terminate Plaintiff's employment on the basis of her race and gender.  In fact, Kent and Cox submitted affidavits stating they did not know Plaintiff's race when they decided to terminate her employment.  [Kent Aff. ¶ 16; Cox Aff ¶ 7].  While it is possible that Kent and Cox could have guessed Plaintiff's ancestry based on her name, this alone is insufficient to show that their stated reason for terminating Plaintiff was false.  Therefore, the Court DISMISSES the Title VII and CFEPA claims with respect to Plaintiff's allegations of race and gender discrimination.

B. Disability Discrimination Claims

Plaintiff also claims that she became disabled as a result of a workplace accident, and that Wells Fargo unlawfully terminated her because this disability, in violation of the ADAA and CFEPA.  The Court analyzes these claims using the *McDonnell Douglass* burden-shifting framework.  *Stefanidis v. Jos. A. Bank*

*Clothiers, Inc.*, No. 3:14-CV-971 (VAB), 2016 WL 845297, at *5-6 (D. Conn. Mar. 2, 2016) (citing *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Prog., Inc.*, 198 F.3d 68, 72 (2d Cir. 1999) (ADA);  *Hopkins v. New Eng. Health Care Employees Welfare Fund*, 985 F. Supp. 2d 240, 255-56 (D. Conn. 2013) (CFEPA)) ("Because the Court need not address the definition of disability to dispose of this case, it will treat the analysis of [the plaintiff's] claims under ADA and CFEPA as the same.").  Wells Fargo does not dispute that Plaintiff was disabled, [Dkt. 57 at 28], and as discussed in Section IV.A.2., *supra*, Defendants have provided a legitimate nondiscriminatory reason for terminating her.  The Court therefore need only determine whether Wells Fargo's proffered reason for terminating the Plaintiff was pretext for disability discrimination.

Neither Ms. Cox nor Ms. Kent were aware of Plaintiff's disability when they decided to terminate her employment.  [Kent Aff. ¶ 18; Cox Aff. ¶ 9].  Moreover, the only evidence Plaintiff has offered of any discriminatory animus are Mr. Bruneau's comment that Plaintiff's doctors were only recommending continued physical therapy "so they can make money," and the fact that he and Mr. McClun asked the Plaintiff how long she would require treatment.  [Dhir Dep. at 265-66].  Because Mr. Bruneau and Mr. McClun did not decide that Plaintiff should be terminated, and Mr. Bruneau recommended against terminating her, these comments are insufficient to show that Plaintiff's termination was motivated by disability discrimination.  Furthermore, the fact that Wells Fargo terminated and reprimanded other, non-disabled employees because of unearned referrals, suggests that the unearned referrals were the "real" reason Plaintiff was

terminated.  Plaintiff's claims for disability discrimination under the ADAA and CFEPA are therefore DISMISSED.

### C.  Worker's Compensation

The Court will not exercise supplemental jurisdiction over Plaintiff's CWCA claim, and therefore dismisses it without prejudice.

### V.  Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED.  The Clerk is directed to close this file.


IT IS SO ORDERED.


_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge


Dated at Hartford, Connecticut:  March 1, 2017